Mrs. Clyde **HAMILTON** et al., Appellants,

v.

**WAPLES–PLATTER COMPANY** et al.,
Appellees.

No. 16891.

Court of Civil Appeals of Texas.

Fort Worth.

Feb. 2, 1968.

King & Massey, and Marion L. Massey, Fort Worth, for appellants.

Brown, Day & Crowley, and M. Hendricks Brown, Fort Worth, for appellees.

OPINION

RENFRO, Justice.

This is an appeal by plaintiffs from a judgment based on a directed verdict in favor of defendants.

Plaintiffs are Mrs. Clyde Hamilton and Charles E. Gilroy, parents of Michael David Gilroy. Defendants are Waples-Platter Company and Jerry A. Snyder, Jr.

It was alleged that on December 27, 1965, at 7:45 P.M., Michael David Gilroy, age 15, was riding his Honda motorbike in an easterly direction in the South lane of Loop 820 in Forest Hills, Tarrant County, when suddenly and without warning a huge International tractor and trailer overtook and collided with young Gilroy, passing over his body, causing fatal injuries which resulted in his death. That the collision occurred about two hundred feet west of the Hartman Lane overpass on Loop 820.

The petition alleged that Snyder, acting in the scope and course of his employment as an agent, servant and employee for Waples-Platter Company, was guilty of the following acts of negligence, each of which was a proximate cause of the injuries sustained by Gilroy: 1, in failing to keep a proper lookout; 2, in traveling at a speed which was greater than was reasonable under the terms and conditions existing immediately prior to the collision; 3, in failing to timely apply his brakes; and 4, in failing to turn to the left immediately prior to the collision. The petition closed with

prayer for damages in the sum of $21,389.-80.

The defendants' answer consisted of a general denial, a plea that the occurrence complained of was caused solely by one or more vehicles which struck and ran over Gilroy prior to the time defendants' vehicle may have had any contact with either the motorbike or Gilroy's body; and that neither defendant was responsible in any manner for the accident. Seven acts of contributory negligence were also charged against Gilroy.

At the conclusion of the plaintiffs' evidence, the court sustained defendants' motion for instructed verdict.

The plaintiffs-appellants base their appeal on the alleged error of the court in granting defendants' motion for instructed verdict and in excluding plaintiffs' exhibit No. 3, a photograph.

By deposition, the defendant Snyder testified the incident occurred around 8:45 P.M., on December 27, 1965. He was returning to Fort Worth from Waco where he had made deliveries during the day. He turned off Highway 81 from Waco onto Loop 820, his destination being the Company's warehouse in Richland Industrial Park. As to his approach to the Hartman overpass, he was asked, "You tell me when you first saw anything unusual in front of you?" He answered, "Just, back just before you get to the bridge, it looked like something, you know how paper or something will look like it flies from something, that is what it looked like. And then when I got to the bridge, might near to the bridge, I seen this other one, immediately I started applying my brakes, started slowing down, but I could not slow down fast enough. I went over the cycle." He did not know whether he ran over the body, but if he did it was because the body was already in the road. He never did see the body until after he had stopped the truck and walked back to the cycle. The thing that looked like paper came from under the truck in front of him. He did not know whether it was the cycle or the body that came from under the truck

ahead. His lights illuminated the truck ahead sufficiently for him to see it was a van type truck. After stopping, he and another truck driver, who had come from behind him, went back to the overpass. The cycle was laying in the approximate middle of the bridge in the left lane of the main traveled portion of the road. The body was laying very near or on the center line just west of the bridge. He did not know whether the following truck ran over the body.

The witness Roy W. McDonald testified by deposition: He entered Loop 820 from Highway No. 81; he was behind Snyder on the Loop; he was approximately one-quarter mile behind Snyder when Snyder reached the bridge in question. He was driving a Montgomery Ward truck; "Well, whenever I come up over the Forest Hill Overpass, well, they was stopped * * * this truck that was in front of me, I seen his brake lights come on, and I am not sure, but I think there was a car running right along the side of me. Now, I couldn't * * * the car might have been ahead of him. Then, his brakes went on, then I went on up there, and I see the obstacle laying in the road. I don't know what it was. And just as I got where my lights picked it up, I swerved over to the left hand and looked over my * * * from my right fender and still couldn't make out what it was, and I pulled on across the overpass, * * *. He (Snyder) was over on the right." He asked Snyder what was laying in the road. Snyder answered, " 'I don't know, but I hit it.' " There was a bob-tail truck following immediately behind witness. "This kid down there in the street. He was rolled up whenever I saw him; but, whenever I got back to him, he was straightened out." The cycle was over on the left shoulder; the body was in the right hand lane about twelve feet off the viaduct. The boy was dead when he reached him. Witness "sure don't" know who ran over him first. He was travelling about 40–45 miles per hour prior to reaching the scene; Snyder probably was running 5 miles per hour faster.

Witness Charlie Smith, police officer of the City of Forest Hill, testified: On the occasion in question he was about two blocks west of the scene of the accident, talking to the driver of a pickup truck; from his position he could not see the scene of the accident; he did not hear any noise from that direction; he received a radio call to go investigate; the boy's body was just west of the Hartman Street bridge, the bike was in the middle of the bridge, about 140 feet apart; there were 33 feet of skid marks to the body, 84 feet beyond the body; at that time of the evening Loop 820 had considerable truck traffic going both east and west and you saw a lot of big van trucks, most of them going east; the posted speed limit is 55 maximum, 40 minimum; the cycle was on the left walkway across the bridge, it appeared to have been knocked to the left above that area; he was told by both Mc-Donald and Snyder that the bob-tail truck did not stop. Snyder told him he had felt something under his truck, had stopped and gone back to see what it was.

There is evidence in the record that Gilroy was wearing a green jacket and blue jeans. The Honda was black.

Dr. Feliks Gwozdz, Chief Deputy Medical Examiner in the Medical Examination Office for Tarrant County, testified: He examined Gilroy's body December 28, 1965, and determined death to have occurred at 8:04 P.M. of the 27th. There was a large fracture beginning at the right side of the neck. This part of the body showed particular markings consistent with the mark of an automobile tire. There was a massive fracture of the cranial bones and massive contusion to the brain itself and this fracture and contusion to the brain was considered to represent the immediate cause of death. There was abrasion of the skin on the right shoulder and the left inguinal which is the lower left abdomen. The left femoral bone was fractured, as well as the right lower leg and the right knee joint. The head wound showed the marks of no more than one set of tires. However, a number of different tires had passed over the body. It is unlikely the same tire caused all the body injuries.

Defendants based their motion for instructed verdict on the grounds there was no evidence of probative force to support any finding of negligence on the part of defendants proximately causing the occurrence, and there was no evidence that Snyder struck Gilroy while he was operating the Honda, or that he even struck Gilroy while he was lying in the street.

In the judgment the court found "* * as a matter of law the plaintiffs' testimony wholly failed to support his pleadings and wholly failed to raise any issue of negligence, or that the death of the said minor deceased was due to any conduct on the part of the defendants; * * *."

On appeal plaintiffs argue that from the testimony as a whole the jury could have found that Snyder never did see Gilroy as the boy came up on Loop 820, collided with him, rolling him under the truck and causing his death, or even if the boy was in the road after having fallen off his bike or being hit by another vehicle, the actual death was caused by Snyder passing over the head of the boy, therefore the jury could have found that Snyder failed to keep a proper lookout.

■ After a careful study of the entire record we find we must agree with the court that there was no competent evidence of probative force to show that defendants' truck caused the injuries to young Gilroy. We must also agree that the record failed to show evidence that Snyder was guilty of any act of negligence on the occasion in question.

■ When the case is taken from the jury, the appellate court is required to review the evidence in the light most favorable to the party against whom the motion is directed and indulge in every reasonable inference therefrom favorable to such party, and disregard all evidence which is favorable to the moving party and which

is not of a conclusive nature. Abrams v. Brent, 362 S.W.2d 155 (Tex.Civ.App., 1962, ref., n. r. e.); Fireman's Fund Insurance Co. v. Martinez, 387 S.W.2d 443 (Tex.Civ. App., 1965, ref., n. r. e.).

Applying the above rule to the evidence in this case, we are forced to conclude that a finding of negligence and proximate cause on the part of the jury would have been based on guess or speculation. We might guess or speculate that Snyder's conduct caused the unfortunate death of the boy. But placing responsibility on one person for the death of another person should be based on more than "guess" or speculation.

■ Plaintiffs, in point two, claim the court erred in excluding their photograph Exhibit No. 3.

There was considerable discussion among the attorneys and the court concerning the introduction of photograph exhibits. Beginning on page 96 of the statement of facts, however, the record reflects the following:

"The Court: All right. Here is what I am going to do. I am going to admit that one, and refuse this one.

"Mr. Massey: Okay. Note our exception.

"The Court: Okay. No. 3 is in.

"Mr. Massey: We offer 3, 4, 5, and 6, and 4 has been excluded?

"The Court: Yes. * * *

"Mr. Massey: Officer, I hand you what has been marked as Plaintiffs' Exhibit No. 3, and I will ask you to identify and orient us there in that photograph, please, sir."

The officer, using the photograph, testified at considerable length. Later, counsel asked, "Officer, the photograph there that I have previously asked you about, Plaintiffs' Exhibit 3, which portion of the body is closest to the camera here?" On cross-examination the witness was again questioned about Exhibit 3.

Obviously Exhibit No. 3 was admitted in evidence. Plaintiffs' point is without merit.

The judgment of the trial court is affirmed.

Affirmed.